FILED
U.S DISTRICT COURT

2006 JUL 28  A 11: 43

DISTRICT OF UTAH

BY:
DEPUTY CLERK

Henry F. Minnerop, *pro hac application pending*
Carter G. Phillips, *pro hac application pending*
Dennis C. Hensley, *pro hac application pending*
Mark D. Hopson, *pro hac application pending*
Jay T. Jorgensen, Utah Bar #8216
Kevin J. Campion, *pro hac application pending*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8020
Facsimile: (202) 736-8711
Email: jjorgensen@sidley.com

David J. Jordan, Utah Bar #1751
David L Mortensen, Utah Bar #8242
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone: (801) 328-3131
Facsimile: (801) 578-6999
Email: djjordan@stoel.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES INDUSTRY ASSOCIATION, a New York-Based Non-Profit Corporation <br><br><br> Plaintiff, <br><br> v. <br><br> R. WAYNE KLEIN, an individual, in his official capacity as Director, Utah Division of Securities, Utah Department of Commerce, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**

Judge Tena Campbell
DECK TYPE: Civil
DATE STAMP: 07/28/2006 @ 13:54:52
CASE NUMBER:  2:06CV00624  TC

Plaintiff the Securities Industry Association ("Plaintiff" or "SIA") complains against defendant R. Wayne Klein in his official capacity as Director, Utah Division of Securities, Utah Department of Commerce, and for its causes of action alleges as follows:

## INTRODUCTION

1.      This lawsuit seeks declaratory and injunctive relief against the enforcement of a recently-enacted law, Utah Senate Bill 3004, which regulates securities transactions in the national markets in part by imposing securities recordkeeping and reporting requirements (the "Utah Recordkeeping and Reporting Requirement"). The Utah Recordkeeping and Reporting Requirement became law on May 26, 2006, and has an effective date of October 1, 2006. Relief is sought pursuant to 42 U.S.C. § 1983, among others, in that the Utah Recordkeeping and Reporting Requirement constitutes state action in violation of the Constitution and laws of the United States.

2.      Plaintiff seeks an order declaring the Utah Recordkeeping and Reporting Requirement invalid under federal law and enjoining the Defendant from taking any action to implement or enforce it. The Utah Recordkeeping and Reporting Requirement is purportedly intended to impose recordkeeping and reporting requirements relating to "short sales" in securities (discussed *infra*), but its over-broad application actually regulates a wide variety of securities transactions, the vast majority of which the Securities and Exchange Commission has determined are proper. The Utah Recordkeeping and Reporting Requirement is invalid because it is preempted by various provisions of federal securities law, including the National Securities Markets Improvement Act of 1996, Section 17A of the Securities Exchange Act of 1934, as

amended, and the Securities and Exchange Commission's ("SEC") Regulation SHO.  In addition

to being expressly and impliedly preempted by federal law, the Utah Recordkeeping and

Reporting Requirement is invalid because it purports to regulate an area that is the exclusive

province of federal law and because it violates the Commerce Clause of the United States

Constitution, Art. I, § 8, cl. 3.

## JURISDICTION AND VENUE

3.      The claims asserted in this Complaint arise under Article I, § 8, cl. 3 of the

United States Constitution (the Commerce Clause); Article VI, cl. 2 of the United States

Constitution (the Supremacy Clause); 15 U.S.C. § 78aa, and 42 U.S.C. § 1983.  Accordingly, this

Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

4.      This Court may issue a declaratory judgment and provide any "further

necessary or proper relief" under 28 U.S.C. §§ 2201-2202.

5.      Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391(b)(1),

(2) and (3), because the defendant resides in this district and a substantial part of the events or

omissions giving rise to this claim occurred in this judicial district.

## THE PARTIES

6.      Plaintiff SIA is a New York-based non-profit corporation with its principal

place of business located at 120 Broadway, 35th Floor, New York, NY 10271.  Established in

1972 through the merger of the Association of Stock Exchange Firms (1913) and the Investment

Banker's Association (1912), SIA's mission is to build and maintain public trust and confidence

in the securities markets.  SIA has a concrete and substantial interest in this litigation, as many of its member firms will be subject to the Utah Recordkeeping and Reporting Requirement.

      7.     Defendant R. Wayne Klein is the Director of the Utah Division of Securities (the "Division") located at 160 East 300 South, Salt Lake City, UT 84114, and is responsible for administering and enforcing the Utah Recordkeeping and Reporting Requirement.  This Complaint is brought against Mr. Klein solely in his official capacity and seeks a declaration that the Utah Recordkeeping and Reporting Requirement violates federal law. The Complaint requests prospective injunctive relief prohibiting implementation and enforcement of the Utah Recordkeeping and Reporting Requirement.

## THE UTAH REPORTING REQUIREMENT

### I.  The Terms Of The Utah Recordkeeping and Reporting Requirement

      8.     The Utah Recordkeeping and Reporting Requirement is an operational reporting and record-keeping requirement that applies to "broker-dealers" registered in the State of Utah.  Under both Utah and federal law, a "broker-dealer" is generally defined as a securities brokerage firm, registered with the SEC, that trades securities on behalf of its customers and/or on its own behalf.  *See* Utah Stat. Ann. § 61-1-13(1)(c)(i); 15 U.S.C. § 78c(a)(4) and (a)(5).  As discussed in paragraph 14, *infra*, most major broker-dealers are licensed to do business in all states.

9.    The Utah Recordkeeping and Reporting Requirement mandates that broker-dealers gather and report specified information whenever three requirements are met:

> (i) the broker-dealer effects a sale or purchase of a "threshold security" (as defined in SEC Regulation SHO);
>
> (ii) the issuer of the threshold security is either domiciled or has its principal office in Utah (a "Utah Threshold Security"); and
>
> (iii) the trade fails to settle within its normal settlement cycle (usually three business days after the date of the trade).
>
> To "settle" a trade refers to the completion of the transaction, whereby the funds and securities are exchanged between the buyer's and seller's brokers (*i.e.*, the contracting counter-parties) through a clearinghouse.  For purposes of brevity, transactions that do not settle within their normal settlement cycle are referred to hereinafter as "Settlement Failures."  The SEC has sometimes referred to instances where a transaction does not settle on a timely basis because the selling broker fails to deliver the security as a "fail to deliver," and that terminology is often used in the authorities cited in this Complaint.

10.    In cases where the Utah Recordkeeping and Reporting Requirement applies, it mandates that the broker-dealer notify the Division of: (i) the name of the issuer whose shares were the subject of the Settlement Failure; (ii) the date of the trade that failed to settle; (iii) the amount of the shares not delivered to settle the trade; and (iv) in the case of a selling broker-dealer, the identity of the broker-dealer's customer account or broker-dealer's own account for which the sale was executed; or (v) in the case of a broker-dealer purchasing the securities, the identity of the person that failed to deliver the security in settlement of the trade.

Pursuant to the Utah Recordkeeping and Reporting Requirement, the Division will then make this information available to the public.

11.     The Utah Recordkeeping and Reporting Requirement imposes severe financial penalties upon any broker-dealer that does not comply with its provisions.  Violation of the Utah Recordkeeping and Reporting Requirement exposes broker-dealers to serious penalties, including: (i) $10,000 for each business day the broker-dealer fails to provide the mandated notice, if the failure is for at least one business day but not more than five business days, or (ii) if the failure is for six or more business days, the greater of: (A) $10,000 for each business day; or (B) the sum of the sales price for each securities share in the subject trade that has not been delivered in settlement.  The Utah Recordkeeping and Reporting Requirement provides the issuer whose securities were the subject of the Settlement Failure with a private right of action to seek these penalties against the broker-dealer as well as 12 percent interest per year, costs and attorney's fees.

12.     The Utah Recordkeeping and Reporting Requirement also imposes joint and several liability for these draconian penalties on a number of individuals in the securities industry, from officers and directors of a broker-dealer to lower level employees of a broker-dealer, such as sales persons, accountants and clerks.  Specifically, the Utah Recordkeeping and Reporting Requirement imposes joint and several liability on:

                (i) principals of the broker-dealer;

                (ii) persons who directly or indirectly control the broker-dealer;

                (iii) partners, officers, or directors of the broker-dealer, or anyone who

"occup[ies] a similar status" or "perform[s] a similar function;" and

(iv) any employee of a broker-dealer who has a duty to report information under the Utah Recordkeeping and Reporting Requirement and "recklessly fails in that duty."

13.     The Utah Recordkeeping and Reporting Requirement is unique to the State of Utah. Neither federal law nor the law of any other state currently imposes such requirements. Indeed, Utah enacted the Utah Recordkeeping and Reporting Requirement after the SEC considered, but declined to adopt, similar requirements under federal law and instead issued regulations that address Settlement Failures and related recordkeeping and reporting issues in a different manner.

## II.  The Scope And Effect Of The Utah Recordkeeping and Reporting Requirement

14.     The Utah Recordkeeping and Reporting Requirement has an unlimited geographic scope. The Utah Recordkeeping and Reporting Requirement extends the reach of Utah's regulation of securities trading into activities that may be undertaken exclusively outside of Utah in other states and countries. It purports to regulate *every* transaction in Utah Threshold Securities by a broker-dealer who is registered to do business in Utah, even if the transaction has no other Utah nexus. Most large and many smaller broker-dealers are registered to do business in multiple U.S. jurisdictions, including Utah. As a result, the Utah Recordkeeping and Reporting Requirement applies to broker-dealers who handle the vast majority of all trades of securities in the United States. The Utah Recordkeeping and Reporting Requirement applies to trades even when the seller, purchaser, and all personnel and events involved in handling the

order and processing the transaction are located outside of Utah in other states or foreign countries.

15.     The Utah Recordkeeping and Reporting Requirement imposes substantial costs on broker-dealers licensed in Utah (which is nearly the entire national securities industry), impedes the efficient functioning of national securities markets, and puts at risk the speed and reliability of the national system for settling securities trades.  Because the SEC does not require broker-dealers to track or report information mandated by the Utah Recordkeeping and Reporting Requirement, few if any broker-dealers have in place the systems to generate reports containing even part of that information.  In most cases, such reports could not be readily generated.  To meet the October 1, 2006 deadline when the Utah Recordkeeping and Reporting Requirement becomes effective, broker-dealers will be required to make substantial changes to their electronic information systems.  Even if it were feasible or appropriate to adopt such changes, broker-dealers would still not have access to certain information that they would be required to report under the Utah Recordkeeping and Reporting Requirement.  Although neither "clearing agencies" nor securities exchanges (both of which are required to be registered with the SEC and are subject to its oversight pursuant to the Exchange Act) are subject to Utah's jurisdiction or purported to be regulated by the Utah Recordkeeping and Reporting Requirement, the challenged statute might require revisions to their information systems.

16.     The various electronic systems used by many broker-dealers are proprietary, so there would be no one-size-fits-all solution to capturing and communicating the data mandated by the Utah Recordkeeping and Reporting Requirement.  In all cases, specific

operating system changes would need to be programmed and implemented for each broker-dealer to generate the kind of reports needed to provide the information mandated by the Utah Recordkeeping and Reporting Requirement.  All of the changes would have to be designed, programmed, and implemented in a matter of months on a web of differing but interconnected systems that are currently operating and processing the trades of between three and four billion shares of securities each day.

17.    The implementation of these changes to the broker-dealers' systems would by highly impractical, if not impossible and, as noted above, might not enable the broker-dealers to comply with the obligations imposed by the Utah Recordkeeping and Reporting Requirement. Moreover, to the extent that broker-dealers can on their own make the changes that would be necessary to comply with the Utah Recordkeeping and Reporting Requirement, the cost of those changes across the industry would be substantial, likely running into the tens of millions of dollars.

**III.  The Objective Of The Utah Recordkeeping and Reporting Requirement**

18.    The ostensible objective of the Utah Recordkeeping and Reporting Requirement is to regulate the practice of short selling without borrowing securities for the purpose of delivery, a practice that the SEC and others have referred to colloquially as "naked short selling." *See, e.g.*, Paul Foy, "Utah Gov. Signs Naked Short Selling Bill," The Associated Press, May 25, 2006; Sara Hansard, "Utah Law May Doom Naked Short Selling," InvestmentNews.com, June 5, 2006.  The Utah Recordkeeping and Reporting Requirement is supposedly intended to identify those who may be engaging in this practice and report private

information regarding their transactions to the Utah Division of Securities.  The Director of the Division is then directed to disclose this information to the general public.

19.     The SEC has explained, "[a] short sale is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller.  In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor.  The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender.  In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security."  Securities Exchange Act Release No. 48709 (Oct. 28, 2003), 68 FR 62972, 62973 (Nov. 6, 2003).

20.     The SEC has concluded that short selling is a longstanding, customary and legal activity that can serve legitimate purposes.  The SEC has stated that "[s]hort selling provides the market with at least two important benefits: market liquidity and pricing efficiency.  Market liquidity is generally provided through short selling by market professionals … who offset temporary imbalances in the buying and selling interest for securities.  Short sales effected in the market add to the selling interest of stock available to purchasers and reduce the risk that the price paid by investors is artificially high because of a temporary contraction of selling interest.  Short sellers covering their sales also may add to the buying interest of stock available to sellers."  *Id.* at 62974.

21.     The SEC has further explained that "[s]hort selling also can contribute to
the pricing efficiency of the equities markets.  Efficient markets require that prices fully reflect
all buy and sell interest.  When a short seller speculates or hedges against a downward movement
in a security, his transaction is a mirror image of the person who purchases the security based
upon speculation that the security's price will rise or to hedge against such an increase.  Both the
purchaser and the short seller hope to profit, or hedge against loss, by buying the security at one
price and selling at a higher price.  The strategies primarily differ in the sequence of transactions.
Market participants who believe a stock is overvalued may engage in short sales in an attempt to
profit from a perceived divergence of prices from true economic values.  Such short sellers add
to stock pricing efficiency because their transactions inform the market of their evaluation of
future stock price performance.  This evaluation is reflected in the resulting market price of the
security." *Id.*

22.     The SEC has also noted that, "[a]lthough short selling serves useful
market purposes, it also may be used to illegally manipulate stock prices." *Id.*  Accordingly,
while "Congress did not directly prohibit short selling … Congress gave the [SEC] broad
authority to regulate short sales." *Id.*  As discussed in greater detail below, the SEC has used the
authority delegated by Congress to regulate short selling and related reporting requirements at
the federal level.

23.     According to the SEC, "[n]aked short selling, while not generally defined
in the federal securities laws or SRO rules, generally refers to selling short without having

borrowed the securities to make delivery."  Securities Exchange Act Release No. 50103 (August 6, 2005), 69 FR 48008, 48009 n.10 (Aug. 6, 2004).

24.     The SEC has concluded that "[n]aked short selling is not necessarily a violation of the federal securities laws or the [SEC's] rules.  Indeed, in certain circumstances, naked short selling contributes to market liquidity.  For example, broker-dealers that make a market in a security generally stand ready to buy and sell the security on a regular and continuous basis at a publicly quoted price, even when there are no other buyers or sellers.  Thus, market makers must sell a security to a buyer even when there are temporary shortages of that security available in the market.  This may occur, for example, if there is a sudden surge in buying interest in that security, or if few investors are selling the security at that time.  Because it may take a market maker considerable time to purchase or arrange to borrow the security, a market maker engaged in bona fide market making, particularly in a fast-moving market, may need to sell the security short without having arranged to borrow shares.  This is especially true for market makers in thinly traded, illiquid stocks ..., as there may be few shares available to purchase or borrow at a given time."  SEC, *Division of Market Regulation: Key Points About Regulation SHO* (April 11, 2005).

25.     Despite the fact that the Utah Recordkeeping and Reporting Requirement is purportedly intended to regulate naked short selling, the new regulatory requirements of the Utah Recordkeeping and Reporting Requirement are not narrowly tailored to address instances of naked short selling.  Rather, the Utah Recordkeeping and Reporting Requirement applies to all Settlement Failures, whether "long" or "short" sales, and regardless of circumstances.

26.     The SEC has noted that not every Settlement Failure is caused by naked short selling and that Settlement Failures are not *per se* violative.  The SEC has found that "[f]ailures to deliver may result from either a short or a long sale.  There may be legitimate reasons for a failure to deliver.  For example, human or mechanical errors or processing delays can result from transferring securities in physical certificate rather than book-entry form, thus causing a failure to deliver on a long sale within the normal three-day settlement period." SEC, *Division of Market Regulation: Key Points About Regulation SHO* (April 11, 2005). Accordingly, not every Settlement Failure is caused by conduct that is in any way improper or illegal.  And although the number of Settlement Failures represents only a small fraction of all securities trades, such failures occur (for a variety of reasons) on a daily basis.  Tens of millions of separate securities transactions occur in the United States every day (involving billions of shares of securities), and of those trades it would not be unusual for thousands of transactions to fail to settle within the normal settlement cycle.

## FEDERAL SECURITIES LAW

### I.  NSMIA: Congress' Ban On State-Enacted Reporting And Recordkeeping Requirements

27.     On October 11, 1996, Congress enacted the National Securities Markets Improvement Act of 1996 ("NSMIA"), Pub. L. No. 104-290, 110 Stat. 3416.

28.     In enacting NSMIA, Congress responded to the widespread view that "the system of dual Federal and state securities regulation ha[d] resulted in a degree of duplicative and unnecessary regulation." H.R. Rep. No. 104-864, at 39 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 3920.  This system of dual regulation was, in Congress' judgment,

"redundant, costly, and ineffective." *Id.* The purpose of NSMIA was therefore to "eliminate duplicative and unnecessary regulatory burdens while preserving important investor protections by reallocating responsibility over the regulation of the nation's securities markets in a more logical fashion between the Federal government and the states." *Id.* at 39-40.

29.     One of the ways in which Congress sought to eliminate the inefficiencies associated with the dual system of federal and state securities regulation was by preempting the states from regulating in certain areas. Specifically, Congress enacted Section 103 of NSMIA, entitled "Broker-Dealer Exemptions From State Law." That provision, now Section 15(h)(1) of the Exchange Act, provides that "[n]o law, rule, regulation, or order, or other administrative action of any State or political subdivision thereof shall establish . . . operational reporting requirements" for broker-dealers, or requirements respecting broker-dealers' "making and keeping" of records, that "differ from, or are in addition to, the requirements in those areas established under [the Exchange Act]." 15 U.S.C. § 78o(h)(1).

## II.   Section 17A Of The Exchange Act: The SEC's Authority To Facilitate The Establishment Of A National Clearance And Settlement System And Related Recordkeeping and Reporting Requirements

30.     Congress enacted Section 17A of the Exchange Act as part of the legislative response to a clearance and settlement crisis in the late 1960s and early 1970s, often referred to as the "paper work crisis." *See Nanopierce Technologies, Inc. v. The Depository Trust and Clearing Corporation*, Supreme Court of Nevada, Case No. 45364, Brief of the Securities and Exchange Commission (February 2006).

31.     Section 17A was enacted based on Congressional findings regarding the importance of uniform standards for the prompt and accurate clearance and settlement of securities transactions.  In particular, Congress found that "(A) The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors. (B) inefficient procedures for clearance and settlement impose unnecessary costs on investors and persons facilitating transactions by and acting on behalf of investors.  (C) New data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement.  (D) The linking of all clearance and settlement facilities and the development of uniform standards and procedures for clearance and settlement will reduce unnecessary costs and increase the protection of investors and persons facilitating transactions by and acting on behalf of investors."  15 U.S.C. § 78q-1(a)(1).

32.     Section 17A directs the SEC to ensure the operation of a uniform national clearance and settlement system.  The SEC is directed "having due regard for the public interest, the protection of investors, the safeguarding of securities and funds, and maintenance of fair competition among brokers and dealers, clearing agencies, and transfer agents, to use its authority under this title-- (i) To facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities (other than exempted securities); and (ii) To facilitate the establishment of linked or coordinated facilities for clearance and settlement of transactions in securities, securities options, contracts of sale for future delivery and options thereon, and commodity options..." *Id.*

### III.    Regulation SHO: The SEC's Implementation Of Its Exclusive Authority Over The National Clearance And Settlement System And Related Reporting Requirements

33.    On October 28, 2003, the SEC issued for public comment proposed Regulation SHO (Securities Exchange Act Release No. 48709 (October 28, 2003), 68 FR 62972 (November 6, 2003)), pursuant to authority granted under a number of provisions of the Exchange Act, including Section 17A of the Exchange Act ("Proposed Regulation SHO").

34.    Proposed Regulation SHO would have, among other things, "require[d] short sellers in all equity securities to locate securities to borrow before selling, and would also [have] impose[d] strict delivery requirements on securities where many sellers have failed to deliver the securities.  In part, this action [was] designed to address the problem of naked short selling."  68 FR at 62972.

35.    Proposed Regulation SHO identified certain "threshold securities" where the "ratio of [transactions where short positions were taken but the shares were not ultimately delivered at settlement] . . . represents a significant number of shares relative to the company's total shares outstanding, thus requiring remedial action designed to address potentially negative effects."  68 FR at 62977.

36.    Proposed Regulation SHO would have required that, "for short sales of any security meeting this threshold, the selling broker-dealer must deliver the security no later than two days after the settlement date," and "if for any reason such security was not delivered within two days after the settlement date, the rule would restrict the broker-dealer, including market makers, from executing future short sales in such security for the person for whose

account the failure to deliver occurred unless the broker-dealer or the person for whose account the short sale is executed borrowed the security, prior to executing the short sale and delivered on settlement date. This restriction would [have been] in effect for a period of 90 calendar days." *Id.*

37.     In addition, Proposed Regulation SHO would have imposed certain requirements on the National Securities Clearing Corporation ("NSCC"), an agency that provides clearing, settlement and information services to the securities industry. The proposed rule would have required the NSCC to amend its rules to: (A) refer a "broker or dealer failing to deliver . . . securities" to the National Association of Securities Dealers ("NASD") and the designated examining authority "for appropriate action;" and (B) "withhold a benefit of any mark-to-market amounts or payments that otherwise would be made to the party failing to deliver, and take other appropriate action, including assessing appropriate charges against the party failing to deliver." *Id.*

38.     The SEC received comments from 462 sources in response to Proposed Regulation SHO. The SEC evaluated those comments and conducted a cost-benefit analysis of the proposed regulation.

39.     On July 28, 2004, the SEC published Regulation SHO as a final rule under the Exchange Act (Securities Exchange Act Release No. 50103 (July 30, 2004), 69 FR 48008 (August 6, 2004)). Based on the comments submitted in response to Proposed Regulation SHO and the SEC's analysis of the various points and objections that were raised, this final rule the SEC adopted made a number of substantial changes to the proposed requirements.

40.     As adopted, Regulation SHO imposes requirements on "threshold securities," which are defined as "any equity security of an issuer that is registered under Section 12, or that is required to file reports pursuant to Section 15(d) of the Exchange Act where, for five consecutive settlement days: there are aggregate fails to deliver at a registered clearing agency of 10,000 shares or more per security; the level of fails is equal to at least one-half of one percent of the issuer's total shares outstanding; and the security is included on a list published by a [self-regulatory organization ("SRO") such as the stock exchanges or the National Association of Securities Dealers]."  69 FR at 48016.

41.     In adopting such definition, the SEC stated that "[t]his narrowly targeted threshold will not burden the vast majority of securities where there are not similar concerns regarding settlement," estimating that only "4.0% of all securities would meet this threshold." *Id.*

42.     The SEC also explained in its release adopting the new Regulation SHO that Settlement Failures are not *per se* manipulative, and may not even violate federal securities laws, noting that "there may be many different causes of fails to deliver that could be unrelated to a market participant engaging in naked short selling.  Thus, imposing a lower threshold or, as suggested by some commenters, prohibiting all fails, might be an impracticable or an overly-broad method of addressing any potential abuses, and could also disrupt the efficient functioning of the Continuous Net Settlement system ("CNS") operated by NSCC." *Id.* at n. 85.

43.     The SEC also modified the proposed close-out requirements applicable to threshold securities to reject the proposal that settlement failures be traced back to the customer

or account that effected the transaction.  In choosing to eliminate this proposed requirement, the SEC noted that "[s]ome commenters argued that under the confines of current settlement practices and procedures, it is not practical to assign delivery failures to a particular clearing firm customer account . . . because NSCC's continuous net settlement system nets all buys and sells in each security for each NSCC participant, broker-dealers cannot determine which customer's transaction or account gave rise to a failure to deliver."  69 FR at 48017.

44.    One of the commenters cited by the SEC was the NSCC itself, which noted that its electronic settlement system nets the various trades of each broker-dealer that participates in the CNS system without tracking information about the individual customer accounts.  "For purposes of settling a participant's open securities transactions on a particular day, the CNS system nets all open positions of the participant, together with such participant's positions due to settle for the first time that day, down to a single value.  In performing this calculation, the CNS system does not retain information regarding the individual transactions that the participant may have executed in a particular security (*e.g.*, whether a transaction was a sale from a long position or a short sale)."  Letter from Donald F. Donahue, President, NSCC, to Jonathan G. Katz, Secretary, Securities and Exchange Commission (April 7, 2004).

45.    In adopting the new Regulation SHO, the SEC stated its intent to continue regulating in this area, noting that "if the Commission believes that the rules as adopted are not having the intended effects of reducing potentially manipulative behavior, we may consider additional rulemaking that could require broker-dealers to identify individual accounts that are causing fails to deliver."  *Id.*

46.     The SEC indicated that it had "considered the comments received, and ha[d] adopted a rule that differs in the mechanics from the proposed rule, but continues to preserve the goal of limiting failures to deliver in threshold securities." *Id.*

47.     As adopted, Regulation SHO "requires action if a fail in a threshold security remains open ten days after settlement date, *i.e.*, for thirteen consecutive settlement days. Specifically, Rule 203(b)(3) requires a participant of a clearing agency registered with the Commission to take action to close out the fail to deliver that has remained for thirteen consecutive settlement days by purchasing securities of like kind and quantity." *Id.*

48.     In extending the Regulation SHO close-out requirement to 13 consecutive settlement days, as opposed to the two days proposed, the SEC explained that "some commenters believed that imposing the delivery requirements two days after settlement, *i.e.*, after five settlement days, would capture many instances of ordinary course settlement delays, rather than address potentially abusive activity." *Id.* at n. 93.

49.     The SEC noted that it had considered, but declined to adopt, the proposed notification requirements, "which would have required a registered clearing agency that processed the transaction to refer the party failing to deliver to the NASD and the designated examining authority for such broker-dealer for appropriate action; and withhold a benefit of any mark-to-market amounts or payments that otherwise would be made to the party failing to deliver." 69 FR at 48018.

50.     Since the adoption of Regulation SHO, and its official effective date of January 3, 2005, the SEC has continued to actively interpret and provide guidance on Regulation SHO.  For example, on July 14, 2006, the SEC, as the appropriate national regulator of the clearance and settlement system and its associated reporting requirements, proposed amendments to Regulation SHO (Securities Exchange Act Release No. 54154 (July 14, 2006), 71 FR 41710 (July 21, 2006)), which were intended to "further reduce the number of persistent fails to deliver in certain equity securities."  These proposed amendments to Regulation SHO were based on examinations by the SEC's staff and the self-regulatory organizations ("SROs") since Regulation SHO's adoption, which preliminarily "indicated that Regulation SHO appears to be significantly reducing fails to deliver without disruption to the market."

51.     The SEC proposed additional requirements to address "a small number of threshold securities with substantial and persistent fail to deliver positions that are not being closed out under existing delivery and settlement guidelines."

52.     Specifically, the SEC proposed the elimination of Regulation SHO's "grandfather" provision, which excluded from Regulation SHO's requirements "fails to deliver established prior to a security becoming a threshold security."  The SEC also proposed to narrow the "options market maker exception," which "excepts any fail to deliver in a threshold security resulting from short sales effected by a registered options market maker to establish or maintain a hedge on options positions that were created before the underlying security became a threshold security."

53.     This action by the SEC evidences its intent to investigate, analyze, and propose additional requirements in this area, as needed.  In taking such action, the SEC is required to follow strict procedures established under the Administrative Procedure Act, whereby the SEC's proposals are published for public comment, and the SEC considers such comments and engages in a thorough cost-benefit analysis of any new requirements, prior to adopting new federal securities regulations.

## **DECLARATION SOUGHT**

54.     SIA realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

55.     SIA seeks declaratory relief under 28 U.S.C. § 2201-2202.

56.     Declaratory relief is appropriate because the validity of the Utah Recordkeeping and Reporting Requirement is a substantial controversy between adverse parties, and because the Court's ruling in this case will have a conclusive and practical effect on this dispute.

57.     In particular, SIA seeks a declaration that the Utah Recordkeeping and Reporting Requirement (as well as any attempt to enforce it) is unlawful because, among other things, it is preempted by federal law and because it violates the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3.

## COUNT I: SUPREMACY CLAUSE (U.S. CONST. ART. VI, CL. 2)

58.     SIA realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

59.     The United States Constitution provides that the laws of Congress are "the supreme Law of the Land." U.S. Const., art. VI, cl. 2. When Congress has chosen to exercise its constitutionally supplied powers, and state law interferes with that exercise, "[i]n every such case, the act of Congress … is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824).

60.     The Utah Recordkeeping and Reporting Requirement is expressly and impliedly preempted by federal securities laws and regulations, including, but not limited to, NSMIA, the Exchange Act, and Regulation SHO, and is therefore invalid under the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2.

61.     The Utah Recordkeeping and Reporting Requirement is expressly and impliedly preempted by NSMIA because, among other reasons, it establishes operational reporting requirements and imposes record-keeping requirements that differ from, or are in addition to, those established under the Exchange Act.

62.     The Utah Recordkeeping and Reporting Requirement is expressly and impliedly preempted by the Exchange Act because, among other reasons, it addresses matters that have been committed to the jurisdiction of the SEC and because it regulates in an area

occupied by, and stands as an obstacle to the accomplishment of, Congress' goal to establish a uniform "national system for the prompt and accurate clearance and settlement of transactions in securities."

63.     The Utah Recordkeeping and Reporting Requirement is expressly and impliedly preempted by Regulation SHO because, among other reasons, it regulates the subject class of securities transactions in a manner that is different from, and in conflict with, the SEC's regulations of the same matters.

64.     SIA is therefore entitled to a declaration that the Utah Recordkeeping and Reporting Requirement is preempted by federal law and therefore void.  SIA is also entitled to preliminary and permanent injunctive relief preventing the implementation and enforcement of the Utah Recordkeeping and Reporting Requirement.

## COUNT II: COMMERCE CLAUSE (U.S. CONST. ART. I, § 8, CL. 3)

65.     SIA realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

66.     The Commerce Clause of the United States Constitution grants Congress the exclusive right to "[r]egulate Commerce among … the several States," U.S. Const. art. I, § 8, cl. 3.  This grant of power to the national Congress prohibits states from regulating interstate commerce.  A state statute that "regulates conduct occurring wholly outside the state" violates the Commerce Clause, *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582 (1986) (quoting *United States Brewers Ass'n, Inc. v. Healey*, 692 F.2d 275, 279 (2d Cir.

1982)), as does a statute that seeks "'directly' to assert extraterritorial jurisdiction over persons or property," *Healy v. Beer Institute*, 491 U.S. 324, 336 n.13 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1989)).

67.     The Utah Recordkeeping and Reporting Requirement violates the Commerce Clause.  By its plain terms, it would regulate conduct that occurs wholly outside of Utah, by directly asserting jurisdiction over individuals, companies and other entities that are located outside of the state.  Specifically, the Utah Recordkeeping and Reporting Requirement mandates that certain securities transactions be reported to the Division, without requiring that any aspect of the transaction occur in Utah.  Indeed, transactions are regulated even if no party to the transaction is a citizen of or resides in Utah.

68.     The vast majority of individuals, companies and other entities that trade in securities are not citizens or residents of Utah.  The vast majority of individuals, companies and other entities who facilitate securities transactions (either as a broker-dealer or in clearance and settlement) are not citizens or residents of Utah.

69.     The Utah Recordkeeping and Reporting Requirement regulates conduct occurring wholly outside the State of Utah and is void.

70.     The promotion and protection of interstate commerce is a central function of the Federal Government.

71.     The securities markets and the associated national system for clearing and settling securities transactions are instrumentalities of interstate and foreign commerce.

72.     The Utah Recordkeeping and Reporting Requirement unreasonably burdens the instrumentalities and flow of interstate commerce by imposing burdens and risks on interstate commerce which far outweigh the local benefits.

73.     The Utah Recordkeeping and Reporting Requirement therefore violates the Commerce Clause of the United States Constitution.  Accordingly, SIA is entitled to a declaration that the Utah Recordkeeping and Reporting Requirement is unconstitutional and therefore void.  SIA is also entitled to preliminary and permanent injunctive relief preventing the implementation and enforcement of the Utah Recordkeeping and Reporting Requirement.

### COUNT III: 42 U.S.C. § 1983 (SUPREMACY CLAUSE)

74.     SIA realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

75.     The Utah Recordkeeping and Reporting Requirement is expressly and impliedly preempted by federal securities laws and regulations, including, but not limited to, NSMIA, the Exchange Act, and Regulation SHO, and therefore deprives SIA and its members of the rights, privileges, and immunities secured to them by those federal laws and by the Supremacy Clause of the United States Constitution  in violation of 42 U.S.C. § 1983.

76.     Defendant R. Wayne Klein, acting in his official capacity as Director of the Division to enforce the Utah Recordkeeping and Reporting Requirement, is a person acting under color of state law within the meaning of 42 U.S.C. § 1983 and is amenable to suit for prospective injunctive relief.

77.     SIA is therefore entitled to a declaration that the Utah Recordkeeping and Reporting Requirement deprives SIA and its members of the rights, privileges, and immunities secured to them by federal law in violation of 42 U.S.C. § 1983 and is therefore void.  SIA is also entitled to preliminary and permanent injunctive relief preventing the implementation and enforcement of the Utah Recordkeeping and Reporting Requirement.

### COUNT IV: 42 U.S.C. § 1983 (COMMERCE CLAUSE)

78.     SIA realleges and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

79.     The Utah Recordkeeping and Reporting Requirement violates the Commerce Clause of the United States Constitution and therefore deprives SIA and its members of the rights, privileges, and immunities secured to them by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

80.     Defendant R. Wayne Klein, acting in his official capacity as Director of the Division to enforce the Utah Recordkeeping and Reporting Requirement, is a person acting under color of state law within the meaning of 42 U.S.C. § 1983 and is amenable to suit for prospective injunctive relief.

81.     SIA is therefore entitled to a declaration that the Utah Recordkeeping and Reporting Requirement deprives SIA and its members of the rights, privileges, and immunities secured to them by federal law in violation of 42 U.S.C. § 1983 and is therefore void.  SIA is

also entitled to preliminary and permanent injunctive relief preventing the implementation and enforcement of the Utah Recordkeeping and Reporting Requirement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SIA prays:

A.     For a declaration that the Utah Recordkeeping and Reporting Requirement is invalid;

B.     For a preliminary and permanent injunction prohibiting Defendant from implementing or enforcing the Utah Recordkeeping and Reporting Requirement in any way;

C.     For such costs and reasonable attorneys' fees to which SIA might be entitled by law;  and

D.     For such other or further relief that this Court deems just and appropriate.


Dated:  July 28, 2006                                Respectfully submitted,


                                                     _____
                                                     Henry F. Minnerop, *pro hac application pending*
                                                     Carter G. Phillips, *pro hac application pending*
                                                     Dennis C. Hensley, *pro hac application pending*
                                                     Mark D. Hopson, *pro hac application pending*
                                                     Jay T. Jorgensen, Utah Bar #8216
                                                     Kevin J. Campion, *pro hac application pending*
                                                     SIDLEY AUSTIN LLP

                                                     David J. Jordan, Utah Bar #1751
                                                     David L Mortensen, Utah Bar #8242
                                                     STOEL RIVES LLP

                                                     Attorneys for Plaintiff
                                                     Securities Industry Association

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

Securities Industry Association

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

David J. Jordan, Stoel Rives LLP, 201 South Main Street, #1100, Salt Lake City, Utah 84111, 801.328.3131

## DEFENDANTS

R. Wayne Klein, in his official capacity as Director, Utah Division of Securities Utah Department of Commerce

FILED
U.S. DISTRICT COURT

2006 JUL 43

County of Residence of First Listed Defendant    Salt Lake County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

DISTRICT OF UTAH

BY:
DEPUTY CLERK

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☒ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

Appeal to District Judge from Magistrate Judgment

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
Article I §8 cl 3 and Article IV cl 2 of the United States Constitution; 42 U.S.C. §1983
Brief description of cause:
Suit challenging constitutionality and enforceability of State Statute.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION     DEMAND $               CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23                                              JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):     JUDGE _____     DOCKET NUMBER _____

DATE
07/28/2006

SIGNATURE OF ATTORNEY OF RECORD
_(signature)_

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____

Judge Tena Campbell
DECK TYPE: Civil
DATE STAMP: 07/28/2006 @ 13:54:52
CASE NUMBER:  2:06CV00624  TC